URBAN JUSTICE CENTER
Haeyoung Yoon (HY-8962)
666 Broadway, 10th Floor
New York, New York 10012
(646) 459-3003

-and-

KOOB & MAGOOLAGHAN
Alexander A. Reinert (AR-1740)
19 Fulton Street, Suite 408
New York, New York 10038
(212) 406-3095

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



CV 04 1809

GLEESON, J.

AZRACK, J.

-------------------------------------------------------------- X

EHAB ELMAGHRABY and JAVAID IQBAL,

       Plaintiffs,

      -against-

JOHN ASHCROFT, Attorney General of the United
States; KATHLEEN HAWK SAWYER, former Director
of the Federal Bureau of Prisons; DENNIS HASTY,
former Warden of the Metropolitan Detention Center;
MICHAEL ZENK, Warden of the Metropolitan
Detention Center; LINDA THOMAS, former Associate
Warden of Programs of the Metropolitan Detention
Center; LIEUTENANT BUCK; LIEUTENANT CUSH;
LIEUTENANT GUSS; LIEUTENANT ORTIZ;
LIEUTENANT PEREZ; LIEUTENANT BIRAR;UNIT
MANAGER SHACK; CORRECTIONS OFFICER
DEFRANCISCO; CORRECTIONS OFFICER
MOUNBO; CORRECTIONS OFFICER ROBINSON;
COUNSELOR COTTON; CORRECTIONS OFFICER
HOSAIN; CORRECTIONS OFFICER TORRES; DR.
LORENZO; and "JOHN DOE" CORRECTIONS
OFFICERS NOS. 1-32, "John Doe" being fictional first
and last names;

       Defendants.

-------------------------------------------------------------- X

Civil Action No. _____

**COMPLAINT AND
JURY DEMAND**



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
*   MAY 3 - 2004   *
BROOKLYN OFFICE

Plaintiffs EHAB ELMAGHRABY and JAVAID IQBAL, by their attorneys, the Urban

Justice Center and Koob & Magoolaghan, allege upon knowledge as to themselves and upon

information and belief as to all other matters as follows:

## NATURE OF ACTION

1. This is an action brought by Plaintiffs EHAB ELMAGHRABY and JAVAID IQBAL

to remedy the brutal mistreatment and discrimination each Plaintiff suffered while in the care,

custody, and control of Defendants. Plaintiffs ELMAGHRABY and IQBAL are Muslim men

from Egypt and Pakistan, respectively. In the months after September 11, 2001, Plaintiffs were

detained at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. Plaintiffs were

arbitrarily classified as being "of high interest" to the government's terrorism investigation after

September 11th, and accordingly were housed in the MDC's Administrative Maximum

("ADMAX") Special Housing Unit ("SHU").

2. While in the ADMAX SHU, Plaintiffs were subjected to a pattern and practice of

cruel, inhuman, and degrading treatment in violation of the First, Fourth, Fifth, Sixth, and Eighth

Amendments to the United States Constitution, federal statutory law, customary international

law, and local law. Among other things, they were deliberately and cruelly subjected to

numerous instances of excessive force and verbal abuse, unlawful strip and body cavity-searches,

the denial of medical treatment, the denial of adequate nutrition, extended detention in solitary

confinement, the denial of adequate exercise, and deliberate interference with their rights to

counsel and to exercise of their sincere religious beliefs. They were placed in tiny cells for more

than 23 hours per day, and strip-searched, manacled and shackled when removed from their

cells. Plaintiffs were housed in the ADMAX SHU in the absence of adequate standards or

procedures for determining that such a classification was appropriate, or that the classification should continue, in violation of the Fifth Amendment to the United States Constitution.

3. Plaintiffs were singled out for such mistreatment because of their race, national origin, and religion. Defendants, by creating, participating in, and endorsing Plaintiffs' systematic mistreatment, violated the principles enunciated in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, the Religious Freedom Restoration Act ("RFRA"), 42 USC § 2000bb, the civil rights conspiracy statute, 42 U.S.C. § 1985(3), and New York City's Human Rights Law ("NYCHRL"), N.Y.C. Code §§8-107, 8-502.

4. As a result of Defendants' misconduct, Plaintiffs suffered severe and permanent physical injuries, and severe emotional distress and humiliation. Plaintiffs now bring this lawsuit to redress these wrongs and to seek just and fair compensation.

## JURISDICTION AND VENUE

5. This action is brought pursuant to Bivens, under the First, Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution, 28 U.S.C. §1350, 42 U.S.C. §§ 1985(3) and 2000bb, and N.Y.C. Code § 8-502.

6. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1350, and 1367.

7. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), as the events giving rise to this action occurred within this district.

## PARTIES

8. Plaintiff EHAB ELMAGHRABY is a native and citizen of Egypt, where he currently resides. He was detained in the MDC from on or about October 1, 2001 to on or about August

3

28, 2002.

9. Plaintiff JAVAID IQBAL is a native and citizen of Pakistan, where he currently resides. He was detained in the MDC from on or about November 5, 2001 to on or about January 15, 2003.

10. Defendant JOHN ASHCROFT is the Attorney General of the United States. As Attorney General, Defendant ASHCROFT has ultimate responsibility for the implementation and enforcement of the immigration and federal criminal laws. He is a principal architect of the policies and practices challenged here. He authorized, condoned, and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs were detained.

11. Defendant KATHLEEN HAWK SAWYER was at all relevant times the Director of the Federal Bureau of Prisons. As such, Defendant SAWYER was responsible for the custody, care and control of the individuals detained in the MDC, including Plaintiffs, and was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged here. She authorized, condoned and/or ratified the unreasonable and excessively harsh conditions under which Plaintiffs were detained.

12. Defendant DENNIS HASTY was at some relevant times the Warden of the MDC. While Warden, Defendant HASTY was responsible for the terms and conditions under which Plaintiffs were confined at the MDC, and for supervising, hiring, and training officers who brutalized and mistreated Plaintiffs. While Warden, Defendant HASTY subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

13. Defendant MICHAEL ZENK is currently the Warden of the MDC. As Warden, Defendant ZENK was responsible at some relevant times for the terms and conditions under which Plaintiffs were confined at the MDC, and for supervising, hiring, and training officers who

4

brutalized and mistreated Plaintiffs. As Warden, Defendant ZENK subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

14. Defendant LINDA THOMAS is the former Associate Warden of Programs of the MDC and was at all relevant times the Associate Warden of Programs of the MDC. While Associate Warden, Defendant THOMAS was responsible for the terms and conditions under which Plaintiffs were confined at the MDC, and for supervising, hiring, and training officers who brutalized and mistreated Plaintiffs. As Associate Warden, Defendant THOMAS subjected Plaintiffs to unreasonable and excessively harsh conditions.

15. Defendant Lieutenant BUCK is and was at all relevant times a federal corrections officer employed at the MDC. Defendant BUCK subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

16. Defendant Lieutenant CUSH is and was at all relevant times a federal corrections officer employed at the MDC. Defendant CUSH subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

17. Defendant Lieutenant GUSS is and was at all relevant times a federal corrections officer employed at the MDC. Defendant GUSS subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

18. Defendant Lieutenant ORTIZ is and was at all relevant times a federal corrections officer employed at the MDC. Defendant ORTIZ subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

19. Defendant Lieutenant PEREZ is and was at all relevant times a federal corrections officer employed at the MDC. Defendant PEREZ subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

20. Defendant Lieutenant BIRAR is and was at all relevant times a federal corrections officer employed at the MDC. Defendant BIRAR subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

21. Defendant SHACK is and was at all relevant times a federal corrections officer employed at the MDC. Defendant SHACK was the Unit Manager for the ADMAX SHU. Defendant SHACK subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

22. Defendant DEFRANCISCO is and was at all relevant times a federal corrections officer employed at the MDC. Defendant DEFRANCISCO subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

23. Defendant MOUNBO is and was at all relevant times a federal corrections officer employed at the MDC. Defendant MOUNBO subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

24. Defendant ROBINSON is and was at all relevant times a federal corrections officer employed at the MDC. Defendant ROBINSON subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

25. Defendant COTTON is and was at all relevant times a corrections counselor employed at the MDC. Defendant COTTON subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

26. Defendant HOSAIN is and was at all relevant times a federal corrections officer employed at the MDC. Defendant HOSAIN subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

27. Defendant TORRES is and was at all relevant times a federal corrections officer

employed at the MDC. Defendant TORRES subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

28.  Defendant LORENZO is and was at all relevant times a physician employed at the MDC and was at all relevant times responsible for the delivery of medical care to Plaintiffs.

29.  Defendants "JOHN DOE" CORRECTIONSS OFFICERS NOS. 1-32, "John Doe" being fictional first and last names, are and were at all relevant times federal corrections officers employed at the MDC. Defendants DOE Nos. 1-32 subjected Plaintiffs to unreasonable and excessively harsh conditions of confinement.

30.  All Defendants named herein acted under color of federal law.

## STATEMENT OF FACTS

### *General Background*

31.  In the months after September 11, 2001, the Federal Bureau of Investigation ("FBI") arrested and detained thousands of Arab Muslim men, designated herein as "post-September 11th detainees," as part of its investigation of the events of September 11.

32.  Many of these men, including Plaintiffs, were classified as being "of high interest" to the government's post-September-11th investigation by the FBI without specific criteria or a uniform classification system.

33.  In many cases, including Plaintiffs', the classification was made because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity.

34.  Many post-September 11th detainees classified as being "of high interest" were confined at the MDC in Brooklyn, New York, in the ADMAX SHU, which is the Federal Bureau of Prisons' ("BOP") most restrictive type of confinement. The ADMAX SHU was quickly

7

created on MDC's ninth floor to house post-September 11th detainees. Prior to September 11, 2001, the MDC had a SHU, but not an ADMAX SHU.

35. The MDC had as many as 60 detainees housed in the ADMAX SHU at one time.

36. The ADMAX SHU enforced a four-man hold restraint policy, the use of hand-held cameras to record detainee movements, cameras in each cell to monitor detainees, and physical security enhancements.

37. The MDC is a "place or provider of public accommodation" as that term is defined in N.Y.C. Code § 8-102(9).

38. Post-September 11th detainees in the ADMAX SHU were subjected to highly restrictive conditions of confinement. They were not permitted to move about the unit, use the telephone freely, nor were they permitted any electronic equipment in their cells, such as small radios. Post-September 11th detainees moved outside their cells only when they were restrained with handcuffs and leg irons and escorted by four staff members.

39. Post-September 11th detainees in the ADMAX SHU were subjected to a communications blackout that barred them from receiving telephone calls, visitors, mail, and from placing telephone calls. During this period, which lasted many weeks, the post-September 11th detainees, including Plaintiffs, were unable to make any contact with their attorneys or families.

40. Compounding this situation, MDC employees often turned away lawyers and family members who came to visit individual post-September 11th detainees by falsely stating that the individual detainee was no longer detained in the MDC.

41. Markedly different from the conditions in the MDC 's general population, detainees in the ADMAX SHU were permitted to leave their cells for only one hour a day, at most, and

8

their legal and social visits were non-contact, with a clear partition between the parties.

42. Because of the highly restrictive nature of the ADMAX SHU, BOP regulations require an employee known as the Segregation Review Official to conduct a weekly review of the status of each inmate housed in the SHU after he has spent seven days in administrative detention or disciplinary segregation. The Segregation Review Official is also required to conduct a formal hearing every 30 days assessing the inmate's status.

43. These review processes were never provided to the post-September 11th detainees, including Plaintiffs. Instead, the detainees were held in the ADMAX SHU until the FBI approved their release to the general population unit. Sometimes, detainees were held in the ADMAX SHU even after they were approved for release to the general population unit by the FBI.

44. Until the FBI approved the release of a particular detainee, MDC policy was to automatically annotate the detainee status with the phrase "continue high security." The post-September 11th detainees were not afforded any hearings, and they remained under restrictive detention in the ADMAX SHU.

45. Moreover, the FBI failed to approve post-September 11 detainees' release to general population based simply on the detainees' race, religion, and national origin, and not based on any evidence that continued detention in ADMAX SHU was relevant to the FBI's investigation of the events of September 11, 2001.

### Cruel and Inhumane Conditions of Confinement in the ADMAX SHU

46. Mr. ELMAGHRABY was arrested on or about September 30, 2001 by local and federal law enforcement agents.

47. On or about October 1, 2001, Mr. ELMAGHRABY was brought to the MDC and

9

housed in the ADMAX SHU.

48.  Mr. ELMAGHRABY was housed in the ADMAX SHU the entire time he was detained at the MDC from on or about October 1, 2001 to on or about August 28, 2002.

49.  Mr. IQBAL was arrested on or about November 2, 2001 by INS and FBI agents.

50.  On or about November 5, 2001 Mr. IQBAL was taken to the MDC and housed in the general population unit on the fifth floor. Mr. IQBAL was housed in the ADMAX SHU from on or about January 8, 2002 until approximately the end of July 2002, at which time he was released back to the general population unit.

51.  While detained in the ADMAX SHU, Plaintiffs were kept in solitary confinement, not permitted to leave their cells for more than one hour each day with few exceptions, verbally and physically abused, routinely subjected to humiliating and unnecessary strip and body-cavity searches, denied access to basic medical care, denied access to legal counsel, denied adequate exercise and nutrition, and subjected to cruel and inhumane conditions of confinement.

52.  The conditions of Plaintiffs' confinement incited fear and anguish, exacerbated their physical pain and emotional distress, and subjected them embarrassment and humiliation.

53.  Plaintiffs were housed in small cells with the lights on almost 24 hours per day. MDC staff deliberately turned on the air conditioner throughout the winter months, and turned on the heat during the summer months.

54.  Plaintiffs were not provided with adequate bedding and personal hygiene items. Until in or about January 2002, Mr. ELMAGHRABY was not given a blanket, pillow, mattress, or any toilet paper. Similarly, Mr. IQBAL was never provided with pillows or more than one blanket.

55.  Whenever Plaintiffs were removed from their cells, they were hand cuffed and shackled around their legs and waist.

10

56. Plaintiffs were subjected to continuous verbal abuse from the MDC staff, demonstrating their animus towards Plaintiffs. Such statements included Mr. IQBAL being called "a terrorist" by Defendant ZENK, "a terrorist and a killer" by Defendant GUSS, a "Muslim bastard" by Defendant COTTON, and a "Muslim killer" by Defendant PEREZ. Mr. ELMAGHRABY was called a terrorist" by Defendant SHACK; when Mr. ELMAGHRABY requested a pair of shoes, Defendant THOMAS responded with a statement, "No shoes for a terrorist"; Defendant COTTON expressed the same animus when he said, "a terrorist should not ask for anything" to Mr. ELMAGHRABY.

57. Plaintiffs were rarely permitted to exercise, and the conditions under which they were permitted to exercise were punitive in effect and intent. For instance, when permitted to exercise in the winter, Plaintiffs were taken to the recreation areas in the ADMAX SHU, which were on the top floor of the MDC in the open-air, in early winter mornings without proper jackets and shoes.

58. On certain days when it rained, MDC officers took Mr. IQBAL to the recreation areas for exercise, and left him in the open-air for hours until he was completely drenched. When Mr. IQBAL was brought back to his cell, the officers deliberately turned on the air conditioner, causing him severe physical discomfort.

59. As the weather became milder, MDC officers permitted Mr. ELMAGHRABY to go to the recreation areas for his exercise. However, the officers permitted him to remain outside for only 15 minutes, in contrast to the cold winter months where the officers left Mr. ELMAGHRABY in the open-air for hours. In the summer months, when it was extremely hot and humid, MDC officers again left Mr. ELMAGHRABY outside for hours.

60. Moreover, Plaintiffs were not provided with adequate food. As a result of the

11

harassment they experienced in the ADMAX SHU, and nutritionally inadequate food, Plaintiffs lost a significant amount of weight. While in custody, Mr. IQBAL lost over 40 pounds, and Mr. ELMAGHRABY lost over 20 pounds. Furthermore, as a result of not having adequate food for a prolonged period of time, Mr. IQBAL currently suffers from persistent digestive problems, causing him to require medical treatment.

61. Such conditions of confinement were punitive in intent and effect.

62. Such conditions of confinement were not related to any legitimate penological interest.

63. Such conditions of confinement were imposed without any individualized determination as to whether they were appropriate for Plaintiffs.

64. Indeed, the MDC's Segregation Review Official never conducted a weekly review of Plaintiffs' status regarding whether or not it was appropriate to continue to detain them in the ADMAX SHU. In addition, during the entire time Plaintiffs were housed in the ADMAX SHU, they never received a formal hearing to determine whether such confinement was appropriate.

65. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, and SHACK each knew of, condoned, and willfully and maliciously agreed to subject Plaintiffs to these conditions of confinement as a matter of policy, solely on account of their religion, race, and/or national origin and for no legitimate penological interest.

66. Defendants ASHCROFT, SAWYER, HASTY, ZENK, and THOMAS willfully and maliciously designed a policy whereby individuals such as Plaintiffs were arbitrarily designated to be confined in the ADMAX SHU without providing any individual determination as to whether such designation was appropriate or should continue.

67. Keeping Plaintiffs in isolation for nearly 24 hours per day, without access to fresh air

12

and light, adequate bedding, adequate heat, and without adequate recreation or exercise, bore no relationship to legitimate security concerns, constituted unjustified punishment, deprived Plaintiffs of their right to liberty, and amounted to the willful, malicious, and unnecessary infliction of pain and suffering.

68.  As a result of Defendants' imposition of unlawful conditions of confinement, Plaintiffs suffered permanent physical injury and emotional distress.

### Use of Excessive Force on Ehab Elmaghraby

69.  Mr. ELMAGHRABY's brutal mistreatment by MDC staff began on the first day he arrived at the facility on or about October 1, 2001, when Defendants ORTIZ and DOE Nos. 1-5 willfully and maliciously threw Mr. ELMAGHRABY against a wall of the MDC, subjected him to repeated strip searches, including leaving him naked for approximately 40 minutes, and threatened him with death.  Defendants ORTIZ and DOE Nos. 1-5 continually accused Mr. ELMAGHRABY of being a terrorist and being associated with Osama bin Laden, Al Qaeda, and the Taliban.  Moreover, when Mr. ELMAGHRABY was transported to court on the same day, Defendants ORTIZ and DOE Nos. 1-5 willfully and maliciously dragged him on the ground while he was chained and shackled, causing him to bleed from his legs.

70.  Upon Mr. ELMAGHRABY's return to the MDC, the officers then brought Mr. ELMAGHRABY up to ADMAX SHU in an elevator.  In the elevator, several officers, including Defendants ORTIZ and DOE Nos. 1-5, willfully and maliciously physically and verbally assaulted him, causing him to bleed from his nose.

71.  Although the officers carried a video camera with them while abusing Mr. ELMAGHRABY, they deliberately turned it off during the entire time the officers physically and verbally abused Mr. ELMAGHRABY.

13

72. The treatment by Defendants ORTIZ and DOE Nos. 1-5 caused Mr. ELMAGHRABY to suffer excruciating pain and emotional distress.

73. Mr. ELMAGHRABY was assaulted a second time, on or about December 1, 2001, when he was willfully and maliciously pushed from behind by Defendant DOE No. 6 upon Mr. ELMAGHRABY's return from recreation.

74. As a result of being shoved, Mr. ELMAGHRABY hit his face on a hard surface and broke his teeth, causing him excruciating pain and emotional distress.

75. The beatings of Mr. ELMAGHRABY were motivated by Defendants' animus against Mr. ELMAGHRABY on account of his race, religion, and/or national origin.

76. There was no legal justification for the assaults and verbal abuse suffered by Mr. ELMAGHRABY.

77. The beatings of Mr. ELMAGHRABY by MDC staff were all pursuant to the customs and practices of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

78. Defendants HASTY, ZENK, THOMAS, and SHACK knew of or should have known of the propensity of their subordinates to inflict unnecessary and assaultive beatings upon Mr. ELMAGHRABY, and Defendants HASTY, ZENK, THOMAS, and SHACK, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

79. As a result of said willful, malicious, and unlawful conduct by Defendants, Mr.

14

ELMAGHRABY suffered severe and permanent physical injury and extreme emotional distress.

### Use of Excessive Force on Javaid Iqbal

80. Consistent with Mr. ELMAGHRABY's experience of physical abuse, Mr. IQBAL was subjected to brutal mistreatment from the very day he was transferred from general population to the ADMAX SHU on or about January 8, 2002, after he was brought back to the MDC from court.

81. On the day he was transferred to the ADMAX SHU, he was told by an officer on the fifth floor that he had a legal visit.

82. Mr. IQBAL was then taken to a room where Defendants DOE Nos. 7-22 were waiting for him. Several of these officers picked him up and threw him against the wall, kicked him in the stomach, punched him in the face, and dragged him across the room. In addition, the officers screamed at him, saying that he was a "terrorist" and a "Muslim."

83. Mr. IQBAL was then taken to the ADMAX SHU. While he was being moved, he was shackled and chained around his arms, legs, and waist.

84. From this incident, Mr. IQBAL suffered serious physical injuries, including bleeding from his mouth and nose, as well as severe emotional distress.

85. Mr. IQBAL was again assaulted on or about March 24, 2002, when Defendants CUSH, GUSS, DEFRANCISCO, and several other MDC officers ordered Mr. IQBAL to submit to a strip and body-cavity search.

86. The officers conducted three serial strip and body-cavity searches of Mr. IQBAL in the same room. Although the officers had a handheld video camera, they turned it off while they conducted the searches.

87. Mr. IQBAL peacefully protested when the officers willfully and maliciously ordered

him to submit to a fourth search.

88. In response, Defendant DEFRANCISCO punched Mr. IQBAL in the face and Defendant CUSH punched Mr. IQBAL in the back and his legs and kicked him in the back. As a result, Mr. IQBAL bled from his mouth. There was no legal justification for Defendants' brutal assault of Mr. IQBAL.

89. The officers next took Mr. IQBAL to the ADMAX SHU. En route to the ADMAX SHU, the officers continued to kick, physically harass, and verbally harass him by making racist and violent comments about Muslims.

90. When they arrived at the ADMAX SHU, Defendants DEFRANCISCO, CUSH, GUSS and DOE No. 22 willfully and maliciously pulled Mr. IQBAL's arm through the slot in his cell door, causing him excruciating pain.

91. Defendant DEFRANCISCO willfully and maliciously urinated in the cell in Mr. IQBAL's toilet, and then turned the water off in the cell so that he could not flush the toilet. Mr. IQBAL was not able to flush the toilet until the next morning.

92. The beatings of Mr. IQBAL were motivated by Defendants' animus against Mr. IQBAL on account of his race, religion, and/or national origin.

93. The beatings of Mr. IQBAL by MDC staff were all pursuant to the customs and practices of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

94. Defendants HASTY, ZENK, THOMAS, and SHACK knew of or should have known of the propensity of their subordinates to inflict unnecessary and assaultive beatings upon Mr.

IQBAL, and Defendants HASTY, ZENK, THOMAS, and SHACK, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

95. As a result of said willful, malicious, and unlawful conduct by Defendants, Mr. IQBAL currently suffers permanent physical and emotional injuries, including but not limited to limited hearing, permanent injury to his right leg, gastrointestinal problems, and depression.

### *Strip and Body Cavity Searches of Mr. Elmaghraby*

96. Mr. ELMAGHRABY was subjected to numerous unreasonable, unnecessary and extreme strip and body-cavity searches while confined in the ADMAX SHU.

97. During the first three or four months of his detention, Mr. ELMAGHRABY was strip searched every morning. The officers ordered him to take off his clothes and inspected him through the slot in the door before they entered the cell. Defendants BUCK, ORTIZ, BIRAR, HOSAIN, MOUNBO, and DOE Nos. 23-26 willfully and maliciously subjected Mr. ELMAGHRABY to these strip searches, although they were not related to any legitimate security or penological interest.

98. Along with being strip searched every morning for the first several months of his detention, every time Mr. ELMAGHRABY went to court, he was strip and body-cavity searched three times.

99. The first search occurred in Mr. ELMAGHRABY's cell in the ADMAX SHU, the second search in a different room in the ADMAX SHU, and the final search on the ground floor of MDC. These searches occurred on or about the following dates: October 1, October 2, November 4, November 8, and December 6, 2001, and January 8, February 12, February 13, June 2, July 2, and July 22, 2002. During these searches, Mr. ELMAGHRABY was ordered to

pass his clothes to a corrections officer and bend over while a corrections officer used a
flashlight to search his body cavities.

100. None of these searches vindicated any legitimate security or penological interest.
Indeed, the second and third searches were particularly egregious, because they were conducted
even though Mr. ELMAGHRABY was in the custody of MDC employees from the moment he
was first searched until after he was searched for the third time.

101. While the strip and body cavity-searches were conducted, Mr. ELMAGHRABY
was threatened, mocked and verbally abused. In addition, he was regularly pushed and shoved.

102. Defendants BUCK, ORTIZ, BIRAR, MOUNBO, HOSAIN, and DOE Nos. 23-26
willfully and maliciously participated in and conducted the strip searches of Mr.
ELMAGHRABY.

103. Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK willfully and
maliciously approved of, endorsed, and/or ordered that the searches take place as a matter of
policy.

104. On many occasions, Defendants conducted the strip searches in an extreme and
outrageous manner. For instance, on one occasion, Defendant BIRAR willfully and maliciously
displayed Mr. ELMAGHRABY while naked to a female employee of the MDC. On or about
October 1, 2001, while Defendants BUCK, ORTIZ, HOSAIN, and MOUNBO were present for a
body-cavity search of Mr. ELMAGHRABY, Defendant BIRAR willfully and maliciously
inserted a flashlight into Mr. ELMAGHRABY's anal cavity. Mr. ELMAGHRABY noticed
blood on the flashlight when it was removed from his anal cavity. Additionally, on or about
January 8, 2002, Defendant ORTIZ, COTTON, HOSAIN and DOE Nos. 23-26 conducted a strip
search of Mr. ELMAGHRABY in which Defendant COTTON willfully and maliciously pushed

18

a pencil into Mr. ELMAGHRABY's anal cavity.

### Strip and Body Cavity Searches of Mr. Javaid Iqbal

105. As with Mr. ELMAGHRABY, Mr. IQBAL was also subjected to numerous unreasonable, unnecessary and extreme strip and body-cavity searches while confined in the ADMAX SHU.

106. Each morning, MDC corrections officers first searched Mr. IQBAL's cell. During this search, Mr. IQBAL was chained and shackled and was routinely kicked and punched by MDC officers.

107. After the cell search, Mr. IQBAL was subjected to a strip and body-cavity search.

108. In addition to the daily strip and body-cavity searches, each time Mr. IQBAL visited the medical clinic for treatment, he was subjected to three strip searches, once before the medical visit and twice after the visit.

109. On days when he appeared in court, Mr. IQBAL was stripped searched twice before he even left the building. As usual, Mr. IQBAL was subjected to a strip and cavity-search on or about 5:30 am. Mr. IQBAL was stripped searched including a cavity search right before the MDC officers escorted him from his cell to the first floor of the building. The second search occurred on or about 7:40 am.

110. Defendants PEREZ, ROBINSON, BUCK, and DOE Nos. 27-32 willfully and maliciously participated in and conducted these strip searches.

111. Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK willfully and maliciously approved of, endorsed, and/or ordered that these searches take place as a matter of policy.

112. On many occasions, Defendants conducted the strip searches in an extreme and

outrageous manner. For instance, on or about March 24, 2002, Defendants CUSH, GUSS,
DEFRANCISCO, and several other MDC officers ordered Mr. IQBAL to submit to a strip and
body-cavity search.

113. The officers conducted three serial strip and body cavity searches of Mr. IQBAL in
the same room. Although the officers had a handheld video camera, they turned it off while they
conducted the searches.

114. Mr. IQBAL peacefully protested when the officers willfully and maliciously
ordered him to submit to a fourth and completely unnecessary search.

115. In response Defendants assaulted Mr. IQBAL, as described in Pars. 85 – 90.

116. The strip search policy established and implemented by Defendants did not
vindicate any legitimate security or penological interest.

117. Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK each knew of,
condoned, and willfully and maliciously agreed to subject Plaintiffs to unreasonable,
unnecessary and extreme strip and body-cavity searches.

118. The imposition of unreasonable, unnecessary and extreme strip and body-cavity
searches were all pursuant to the customs and practices of the MDC. Such unlawful customs and
practices were known or should have been known to Defendants SAWYER, HASTY, ZENK,
and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of
failing to take remedial action, subsequently failed to institute, create, or enforce reasonable
policies or procedures to curtail such unlawful activity.

119. Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK knew of or should
have known of the propensity of their subordinates to conduct unreasonable, unnecessary and
extreme strip searches, and Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK,

with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

120. Plaintiffs were subjected to unreasonable, extreme and unnecessary strip and body-cavity searches because of their race, religion, and/or national origin and for not legitimate penological purpose.

121. As a result of Defendants' actions, Plaintiffs suffered physical injury, extreme emotional distress, humiliation, and embarrassment.

### *Interference with Religious Practice*

122. During the entire time that Plaintiffs were confined in the ADMAX SHU, their sincere religious practices and beliefs were constantly burdened and met with interference. Such interference included banging on the cells when they were praying, routinely confiscating their Koran, and refusing to permit Plaintiffs to participate in Friday prayer services with fellow Muslims.

123. When Plaintiffs asked for Friday prayer services with fellow Muslims, they were met with comments such as, "No prayers for terrorists" by Defendant THOMAS and "Why do you need to pray when you are in jail? Go to sleep," by Defendant SHACK.

124. Said interference was an undue burden on Plaintiffs' sincere religious practice and belief.

125. Moreover, the targeting of Plaintiffs for physical and verbal harassment and the imposition of restrictive conditions of confinement constituted an undue burden on Plaintiffs' sincere religious practice and belief.

126. Although Mr. ELMAGHRABY complained to Defendants THOMAS, HASTY,

ZENK, SHACK, COTTON, and BIRAR about the interference with his religious practice, said Defendants willfully and maliciously refused to take any action to remedy the situation.

127.  Defendants SHACK, PEREZ, DEFRANCISCO, TORRES, and COTTON were each aware of the interference with Mr. IQBAL's religious practice, and nonetheless each Defendant agreed to, endorsed, and willfully and maliciously participated in the routine confiscation of his Koran.

128.  Defendants HASTY, ZENK, THOMAS, and SHACK each knew of, condoned, and willfully and maliciously failed to prevent this interference with Plaintiffs' religious practice.

129.  The interference with Plaintiffs' religious practice by MDC staff were all pursuant to the customs and practices of the MDC.  Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

130.  Defendants HASTY, ZENK, THOMAS, and SHACK knew of or should have known of the propensity of their subordinates to interfere with Plaintiffs' religious practice, and Defendants HASTY, ZENK, THOMAS, and SHACK, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

131.  Defendants did not similarly interfere with the religious practice of non-Muslims.

132.  As a result of Defendants' intentional interference with Plaintiffs' religious practice, each Plaintiff suffered extreme emotional distress.

### *Interference with Right to Counsel*

133. Defendant COTTON was the counselor for the ADMAX SHU and determined whether and when detainees were permitted visitation or phone calls.

134. While in the ADMAX SHU, Plaintiffs' communication with their legal counsel was substantially interfered with by Defendants COTTON and SHACK.

135. For instance, from on or about October 1, 2001, until in or about the last week of November 2001, Defendant COTTON prohibited Mr. ELMAGHRABY from speaking by telephone with his criminal defense attorney.

136. After in or about November 2001, on those occasions when Mr. ELMAGHRABY was permitted to speak with his criminal attorney, Defendant COTTON stood nearby and disconnected the phone when Mr. ELMAGHRABY complained about any of the conditions of his confinement in the ADMAX SHU.

137. Similarly, on those occasions when Mr. IQBAL was permitted to speak with his criminal attorney, Defendant COTTON stood nearby and disconnected the phone if Mr. IQBAL complained about any of the conditions of his confinement in the ADMAX SHU.

138. When Mr. ELMAGHRABY's attorney tried to visit him at the MDC, she often waited for hours without seeing Mr. ELMAGHRABY.

139. On those occasions when Mr. ELMAGHRABY was able to meet with his attorney at the MDC, a video camera recorded the visit and when he returned to his cell, he would find that it had been ransacked. On these occasions, even though his legal visit was non-contact, Mr. ELMAGHRABY was forced to submit to a strip search.

140. Mr. IQBAL's attorney was turned away from the MDC several times, being falsely informed that Mr. IQBAL had been transferred to another facility. Additionally, Defendant SHACK routinely delayed Mr. IQBAL's receipt of legal mail, sometimes by up to two months.

141. As a result, Plaintiffs' communication with counsel was substantially interfered with.

142. Defendants HASTY, ZENK, THOMAS, COTTON and SHACK each knew of and condoned the imposition of substantial restrictions on Plaintiffs' right to communicate with counsel.

143. The imposition of these restrictions was all pursuant to the customs and practices of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

144. Defendants HASTY, ZENK, THOMAS, and SHACK knew of or should have known of the propensity of their subordinates to substantially interfere with Plaintiffs' right to counsel, and Defendants HASTY, ZENK, THOMAS, and SHACK, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

145. Plaintiffs' right to communicate with counsel was interfered with because of their race, religion, and/or national origin.

146. As a result of Defendants' actions, Plaintiffs suffered extreme emotional distress.

### Deliberate Indifference to Serious Medical Needs

147. Both Plaintiffs also were denied access to constitutionally adequate medical care.

148. On or about December 1, 2001, Mr. ELMAGHRABY was pushed from behind by Defendant DOE No. 6, upon Mr. ELMAGHRABY's return from recreation.

24

149. As a result of being shoved, Mr. ELMAGHRABY hit his face on a hard object and broke his teeth.

150. Defendant LORENZO provided Mr. ELMAGHRABY with antibiotics for his injury, but they were confiscated by Defendant ORTIZ when Mr. ELMAGHRABY returned to the ADMAX SHU.

151. Mr. ELMAGHRABY complained to Defendant SHACK, who asked Mr. ELMAGHRABY why he needed his teeth.

152. As a result of Defendants' mistreatment, Mr. ELMAGHRABY suffered extreme pain and emotional distress.

153. Moreover, while Mr. ELMAGHRABY was confined in the ADMAX SHU, Defendant LORENZO erroneously diagnosed him with asthma and prescribed him with asthma medication.

154. As a result of Defendant LORENZO's misdiagnosis, Mr. ELMAGHRABY's actual condition, hypothyroid, became worse and he had to undergo surgery to correct the problem.

155. As a result of this cruel and inhuman treatment, Mr. ELMAGHRABY suffered and continues to suffer severe emotional distress, as well as persistent physical injuries.

156. On or about March 25, 2002, the day after Mr. IQBAL had been beaten by Defendants CUSH and DEFRANCISCO, as described in Pars. 85-90, Mr. IQBAL requested medical assistance from Defendant LORENZO. Defendant SHACK, however, told Defendant LORENZO to leave the ADMAX SHU without providing any medical assistance, and Defendant COTTON also refused Mr. IQBAL's requests for medical assistance.

157. Mr. IQBAL did not receive any medical care for two weeks after he was brutally assaulted, despite the fact that he was experiencing excruciating pain and suffering.

25

158. Defendants LORENZO, COTTON, ORTIZ, and SHACK willfully and maliciously failed and refused to provide adequate medical care to Plaintiffs. Said deficiencies in the provision of adequate medical care include but are not limited to the following: Defendants LORENZO, COTTON, and SHACK's refusal to provide treatment to Mr. IQBAL until about two weeks after he was assaulted on or about March 24, 2002; Defendant LORENZO's failure to properly diagnose Mr. ELMAGHRABY's hypothyroid condition; and Defendants ORTIZ and SHACK's confiscation of the antibiotics prescribed by Defendant LORENZO as a result of the brutal assault of Mr. ELMAGHRABY on or about December 1, 2001.

159. Defendants LORENZO, COTTON, ORTIZ, and SHACK, acting under color of federal law, by their actions and/or omissions, willfully and maliciously demonstrated deliberate indifference to Plaintiffs' life and safety and/or serious medical needs.

160. Defendants LORENZO, COTTON, ORTIZ, and SHACK, acting under color of federal law, by their actions and/or omissions, willfully and maliciously denied Plaintiffs' life, liberty, and/or property without due process of law.

161. Defendants LORENZO, COTTON, ORTIZ, and SHACK each knew or should have known of the deficiencies alleged herein which were within his/her jurisdiction.

162. Defendants LORENZO, COTTON, ORTIZ, and SHACK each knew or should have known that there was a foreseeable risk of serious harm as a result of the deficiencies alleged herein.

### *General Allegations*

163. Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, COTTON, HOSAIN, TORRES, LORENZO, and DOE Defendants NOS. 1-32 each knew of, participated in, and willfully and maliciously

subjected Plaintiffs to the mistreatment described herein.

164. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, COTTON, HOSAIN, TORRES, and DOE Defendants Nos. 1-32 were aware of, approved of, and willfully and maliciously created these unlawful conditions of confinement.

165. The repeated beatings and mistreatment of Plaintiffs were pursuant to the policy and practice of the MDC. Such unlawful customs and practices were known or should have been known to Defendants HASTY, ZENK, and THOMAS, who with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

166. Defendants HASTY, ZENK, THOMAS, and SHACK knew of or should have known of the propensity of their subordinates to subject Plaintiffs to the beatings and other mistreatment described herein, and Defendants HASTY, ZENK, THOMAS, and SHACK, with deliberate indifference to and/or reckless disregard for the risk of failing to take remedial action, subsequently failed to institute, create, or enforce reasonable policies or procedures to curtail such unlawful activity.

167. Defendants specifically targeted Plaintiffs for mistreatment because of Plaintiffs' race, religion, and/or national origin.

168. Defendants' conduct imposed an undue burden on Plaintiffs' sincere religious belief and practice.

169. As a result of Defendants' malicious, willful, and unlawful conduct, Plaintiffs suffered severe and permanent physical injuries and severe emotional distress.

27

## FIRST CAUSE OF ACTION
### (Conditions of Confinement – Fifth Amendment Due Process)

170. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 169.

171. By willfully and maliciously subjecting Plaintiffs to outrageous, excessive, cruel, inhuman and degrading conditions of confinement, including the denial of adequate nutrition, the denial of adequate exercise, the imposition of unnecessary and unlawful strip and body-cavity searches, extended detention in solitary confinement, and subjection to unprovoked and unjustified physical and emotional abuse, Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, and DOE Defendants NOS. 1-32, acting under color of law and their authority as federal officers, have deprived Plaintiffs of liberty and/or property without due process of law in violation of the Fifth Amendment to the United States Constitution. Defendants HASTY, ZENK, THOMAS, and SHACK, by failing to take reasonable measures to prevent and/or to remedy Plaintiffs' mistreatment, have deprived Plaintiffs of liberty and/or property without due process of law in violation of the Fifth Amendment to the United States Constitution.

172. As a result of Defendants' unlawful conduct, Plaintiffs have suffered severe pain and suffering, including physical injuries, emotional distress, humiliation, and embarrassment, and accordingly each Plaintiff is entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, and DOE Defendants NOS. 1-32 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Assignment to ADMAX SHU – Fifth Amendment Due Process)

173. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 172.

174. By willfully and maliciously adopting, promulgating and implementing the policy and practice under which Plaintiffs were confined to solitary confinement in the ADMAX SHU in an arbitrary and unreasonable manner, without any defined criteria, contemporaneous review, or process of any sort, and by which classifications Plaintiffs experienced unnecessary and unreasonable restrictions on their liberty that were atypical and significant departures from the restrictions imposed upon detainees in general population, Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, and SHACK, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiffs of liberty without due process of law in violation of the Fifth Amendment to the United States Constitution.

175. As a result of Defendants' unlawful conduct, Plaintiffs suffered emotional distress humiliation, and embarrassment, and accordingly each Plaintiff is entitled to compensatory damages against ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, and SHACK jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Excessive Force – Fifth Amendment Due Process)

176. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 175.

177. The unprovoked, unjustified, willful, and malicious intentional beatings of Plaintiffs by Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO,

MOUNBO, ROBINSON, COTTON and DOE NOS.1-22 deprived Plaintiffs of their right to liberty and property in violation of the Fifth Amendment to the United State Constitution. Defendants HASTY, ZENK, THOMAS, and SHACK, by failing to take reasonable measures to prevent and/or to remedy their subordinates' abuse of Plaintiffs, deprived Plaintiffs of their right to liberty and property in violation of the Fifth Amendment to the United States Constitution.

178. As a proximate result of the excessive force wielded against them, Plaintiffs sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause Plaintiffs great pain and suffering, both mental and physical, and accordingly each Plaintiff is entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, COTTON and DOE NOS.1-22 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Excessive Force – Eighth Amendment Cruel and Unusual Punishment)

179. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 178.

180. The unprovoked, unjustified, willful, and malicious intentional beatings of Plaintiffs by Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, COTTON and DOE NOS.1-22 constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Defendants HASTY, ZENK, THOMAS, and SHACK, by failing to take reasonable measures to prevent and/or to remedy their subordinates' abuse of Plaintiffs, violated the Eighth Amendment's prohibition against cruel and unusual punishment.

30

181. As a proximate result of the excessive force wielded against them, Plaintiffs sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause Plaintiffs great pain and suffering, both mental and physical, and accordingly each Plaintiff is entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, COTTON and DOE NOS.1-22 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Interference with Right to Counsel – Sixth Amendment)

182. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 181.

183. By willfully and maliciously adopting, promulgating, failing to prevent, failing to remedy, and/or implementing the policy and practice under which Plaintiffs' access to counsel was substantially interfered with, Defendants HASTY, ZENK, THOMAS, SHACK, and COTTON violated Plaintiffs' right to counsel guaranteed by the Sixth Amendment of the United States Constitution.

184. As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, and embarrassment, and accordingly each Plaintiff is entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, and COTTON jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Denial of Medical Treatment – Fifth Amendment Due Process)

185. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 184.

186. By denying Plaintiffs their right to adequate medical examination and care, Defendants LORENZO, COTTON, ORTIZ, and SHACK deprived Plaintiffs of their liberty and property without due process of law in violation of the Fifth Amendment to the United States Constitution.

187. As a result of Defendants' unlawful conduct, Plaintiffs sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to cause Plaintiffs great emotional distress and physical pain and suffering, and accordingly each Plaintiff is entitled to compensatory damages against LORENZO, COTTON, ORTIZ, and SHACK jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (Denial of Medical Treatment – Eighth Amendment Cruel and Unusual Punishment)

188. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 187.

189. By denying Plaintiffs their right to adequate medical examination and care, Defendants LORENZO, COTTON, ORTIZ, and SHACK exhibited deliberate indifference to Plaintiffs' serious medical needs in violation of the Eighth Amendment to the United States Constitution.

190. As a result of Defendants' unlawful conduct, Plaintiffs sustained permanent injuries and incurred medical bills and other expenses. These injuries have caused and will continue to

32

cause Plaintiffs great emotional distress and physical pain and suffering, and accordingly each

Plaintiff is entitled to compensatory damages against LORENZO, COTTON, ORTIZ, and

SHACK jointly and severally in an amount to be determined at trial and punitive damages

against each Defendant in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (Conditions of Confinement – Eighth Amendment Due Process)

191. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in

paragraphs numbered 1 through 190.

192. By willfully and maliciously subjecting Plaintiffs to outrageous, excessive, cruel,

inhuman and degrading conditions of confinement, including the denial of adequate nutrition, the

denial of adequate exercise, the imposition of unnecessary and unlawful strip and body-cavity

searches, extended detention in solitary confinement, and subjection to unprovoked and

unjustified physical and emotional abuse, Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ,

BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES,

and DOE Defendants NOS. 1-32, acting under color of law and their authority as federal officers,

subjected Plaintiffs to cruel and unusual punishment in violation of the Eighth Amendment to the

United States Constitution. Defendants HASTY, ZENK, THOMAS, and SHACK, by failing to

take reasonable measures to prevent and/or to remedy Plaintiffs' mistreatment, subjected

Plaintiffs to cruel and unusual punishment in violation of the Eighth Amendment to the United

States Constitution.

193. As a result of Defendants' unlawful conduct, Plaintiffs have suffered severe pain

and suffering, including physical injuries, emotional distress, humiliation, and embarrassment,

and accordingly each Plaintiff is entitled to compensatory damages against HASTY, ZENK,

THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO,

33

MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, and DOE Defendants NOS. 1-32
jointly and severally in an amount to be determined at trial and punitive damages against each
Defendant in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Unreasonable Strip and Body Cavity-Searches – Fourth Amendment)

194. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in
paragraphs numbered 1 through 193.

195. By willfully and maliciously adopting, promulgating, failing to prevent, failing to
remedy, and/or implementing the policy and practice under which Plaintiffs were repeatedly
subjected to unreasonable and unjustified strip and body-cavity searches, Defendants SAWYER,
HASTY, ZENK, THOMAS, SHACK, BUCK, ORTIZ, BIRAR, MOUNBO, HOSAIN, PEREZ,
ROBINSON, GUSS, DEFRANCISCO, and DOES No. 23-32 Subjected Plaintiffs to
unreasonable searches and seizures in violation of the Fourth Amendment to the United States
Constitution.

196. As a result of Defendants' SAWYER, HASTY, ZENK, THOMAS, SHACK,
BUCK, ORTIZ, BIRAR, MOUNBO, HOSAIN, PEREZ, ROBINSON, GUSS, DEFRANCISCO,
and DOES No. 23-32's unlawful conduct, Plaintiffs suffered physical injuries, emotional
distress, humiliation, and embarrassment, and accordingly are entitled to. Plaintiffs are therefore
entitled to compensatory damages against SAWYER, HASTY, ZENK, THOMAS, SHACK,
BUCK, ORTIZ, BIRAR, MOUNBO, HOSAIN, PEREZ, ROBINSON, GUSS, DEFRANCISCO,
and DOES No. 23-32 jointly and severally in an amount to be determined at trial and punitive
damages against each Defendant in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Interference With Religious Practice – First Amendment)

197.  Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 196.

198.  Defendants HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ, DEFRANCISCO, and TORRES, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of interfering with Plaintiffs' religious practices, violated Plaintiffs' rights under the First Amendment to the United States Constitution.

199.  As a result, Plaintiffs suffered extreme emotional distress and accordingly are entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ, DEFRANCISCO, and TORRES jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### (Discrimination Against Muslims – First Amendment)

200.  Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 199.

201.  Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ, DEFRANCISCO, and TORRES, by adopting, promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of imposing harsher conditions of confinement on Plaintiffs because of Plaintiffs' sincere religious beliefs violated Plaintiffs' rights under the First Amendment to the United States Constitution.

202.  As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against

35

ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ,

DEFRANCISCO, and TORRES jointly and severally in an amount to be determined at trial and

punitive damages against each Defendant in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (Race Discrimination – Fifth Amendment Equal Protection)

203. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in

paragraphs numbered 1 through 202.

204. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK,

BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON,

HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32, by adopting,

promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of

imposing harsher conditions of confinement on Plaintiffs because of Plaintiffs' race violated

Plaintiffs' rights under the Fifth Amendment to the United States Constitution.

205. As a result, Plaintiffs suffered extreme physical injuries and emotional distress,

including permanent injuries, and accordingly are entitled to compensatory damages against

ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ,

PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES,

LORENZO, and DOE Defendants NOS. 1-32, jointly and severally in an amount to be

determined at trial and punitive damages against each Defendant in an amount to be determined

at trial.

## THIRTEENTH CAUSE OF ACTION
### (Conditions of Confinement – RFRA)

206. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in

paragraphs numbered 1 through 205.

207. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK,

BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON,

HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32, by adopting,

promulgating, failing to prevent, failing to remedy, and/or implementing a policy and practice of

imposing harsher conditions of confinement on Plaintiffs because of Plaintiffs' sincere religious

beliefs, substantially burdened Plaintiffs' religious exercise and belief, without any legitimate

justification, in violation of 42 U.S.C. §§ 2000bb-1.

208. As a result, Plaintiffs suffered extreme physical injuries and emotional distress,

including permanent injuries, and accordingly are entitled to compensatory damages against

ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ,

PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES,

LORENZO, and DOE Defendants NOS. 1-32 jointly and severally in an amount to be

determined at trial and punitive damages against each Defendant in an amount to be determined

at trial.

### FOURTEENTH CAUSE OF ACTION
### (Interference With Religious Practice – RFRA)

209. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in

paragraphs numbered 1 through 208.

210. Defendants HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ,

DEFRANCISCO, TORRES, and COTTON, by adopting, promulgating, failing to prevent,

failing to remedy, and/or implementing a policy and practice of confiscating Plaintiffs' religious

materials, regularly interrupting Plaintiffs' daily prayers, and denying Plaintiffs access to Friday

prayers, substantially burdened Plaintiffs' religious exercise and belief, without any legitimate

justification, in violation of 42 U.S.C. §§ 2000bb-1.

211. As a result, Plaintiffs suffered extreme emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, COTTON, BIRAR, PEREZ, DEFRANCISCO, TORRES, and COTTON jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

### FIFTEENTH CAUSE OF ACTION
### (Excessive Force – RFRA)

212. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 211.

213. Defendants BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, COTTON and DOE NOS.1-22, by brutally beating and verbally abusing Plaintiffs because of Plaintiffs' sincere religious beliefs, imposed a substantial burden on Plaintiffs' religious exercise and belief, without any legitimate justification, in violation of 42 U.S.C. §§ 2000bb-1. Defendants, HASTY, ZENK, THOMAS, and SHACK, by failing to take reasonable measures to prevent and/or to remedy their subordinates' abuse of Plaintiffs, acted in violation of 42 U.S.C. §§ 2000bb-1.

214. As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, DEFRANCISCO, MOUNBO, ROBINSON, COTTON and DOE NOS.1-22 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

38

## SIXTEENTH CAUSE OF ACTION
### (Religious Discrimination – 42 U.S.C. § 1985(3))

215.   Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 214.

216.   Defendants, by engaging in the following conduct, agreed to deprive Plaintiffs of the equal protection of the laws and of equal privileges and immunities of the laws of the United States because of Plaintiffs' sincere religious belief, resulting in injury to Plaintiffs' person and property, in violation of 42 U.S.C. § 1985(3):  Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, and SHACK's agreement to subject Plaintiffs to unnecessarily harsh conditions of confinement in ADMAX SHU without due process of law; Defendants ORTIZ and DOE. Nos. 1-5's agreement to brutally mistreat Mr. ELMAGHRABY on or about October 1, 2001; Defendants DOE Nos. 7-22's agreement to brutally assault Mr. IQBAL on or about January 8, 2002; Defendants CUSH, GUSS, DEFRANCISCO's agreement to subject Mr. IQBAL to unnecessary strip and body-cavity searches on or about March 24, 2002, and brutally beat him in response to his peaceful protest of the searches; Defendants BUCK, ORTIZ, BIRAR, HOSAIN, and MOUNBO's agreement on or about October 1, 2001 to conduct an extreme and cruel body-cavity search of Mr. ELMAGHRABY during which Defendant BIRAR willfully and maliciously inserted a flashlight into Mr. ELMAGHRABY's anal cavity; Defendants ORTIZ, COTTON, HOSAIN and DOE Nos. 23-26's agreement on or about January 8, 2002 to conduct an extreme and cruel strip search of Mr. ELMAGHRABY in which Defendant COTTON willfully and maliciously pushed a pencil into Mr. ELMAGHRABY's anal cavity; Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK's agreement to subject Plaintiffs to unnecessary and extreme strip and body-cavity searches as a matter of policy; Defendants SHACK, PEREZ, DEFRANCISCO, TORRES, and COTTON's agreement to routinely

39

confiscate Mr. IQBAL's Koran; and Defendants THOMAS, HASTY, ZENK, SHACK,

COTTON, and BIRAR's agreement to substantially burden Mr. ELMAGHRABY's religious

practice while he was housed in ADMAX SHU.

217. As a result, Plaintiffs suffered extreme physical injuries and emotional distress,

including permanent injuries, and accordingly are entitled to compensatory damages against

ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ,

PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, HOSAIN, COTTON, TORRES, and

DOE Defendants Nos. 1-5 and 7-26 jointly and severally in an amount to be determined at trial

and punitive damages against each Defendant in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION
### (Race and National Origin Discrimination – 42 U.S.C. § 1985(3))

218. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in

paragraphs numbered 1 through 217.

219. Defendants, by engaging in the following conduct, agreed to deprive Plaintiffs of

the equal protection of the laws and of equal privileges and immunities of the laws of the United

States because of Plaintiffs' race and/or national origin, resulting in injury to Plaintiffs' person

and property, in violation of 42 U.S.C. § 1985(3): Defendants ASHCROFT, SAWYER,

HASTY, ZENK, THOMAS, and SHACK's agreement to subject Plaintiffs to unnecessarily

harsh conditions of confinement in ADMAX SHU without due process of law; Defendants

ORTIZ and DOE. Nos. 1-5's agreement to brutally mistreat Mr. ELMAGHRABY on or about

October 1, 2001; Defendants DOE Nos. 7-22's agreement to brutally assault Mr. IQBAL on or

about January 8, 2002; Defendants CUSH, GUSS, DEFRANCISCO's agreement to subject Mr.

IQBAL to unnecessary strip and body-cavity searches on or about March 24, 2002, and brutally

beat him in response to his peaceful protest of the searches; Defendants BUCK, ORTIZ, BIRAR,

HOSAIN, and MOUNBO's agreement on or about October 1, 2001 to conduct an extreme and cruel body-cavity search of Mr. ELMAGHRABY during which Defendant BIRAR willfully and maliciously inserted a flashlight into Mr. ELMAGHRABY's anal cavity; Defendants ORTIZ, COTTON, HOSAIN and DOE Nos. 23-26's agreement on or about January 8, 2002 to conduct an extreme and cruel strip search of Mr. ELMAGHRABY in which Defendant COTTON willfully and maliciously pushed a pencil into Mr. ELMAGHRABY's anal cavity; and Defendants SAWYER, HASTY, ZENK, THOMAS, and SHACK's agreement to subject Plaintiffs to unnecessary and extreme strip and body-cavity searches as a matter of policy.

220. As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, SHACK, BUCK, CUSH, GUSS, ORTIZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, HOSAIN, COTTON, and DOE Defendants Nos. 1-5 and 7-26 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

### EIGHTEENTH CAUSE OF ACTION
### (Religious Discrimination – NYCHRL)

221. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 220.

222. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32, by implementing, adopting, enforcing, failing to prevent, failing to remedy, and/or promulgating a policy and practice whereby Plaintiffs were harassed, physically and verbally abused, subjected to harsh conditions of confinement, subjected to routine strip and body-cavity searches, burdened

41

in the practice of their sincere religious beliefs, denied adequate exercise, nutrition, medical care, denied access to counsel, and confined in the ADMAX SHU because of their sincere religious beliefs, violated N.Y.C. Code §§8-107(4), 8-502.

223.  As a result, Plaintiffs suffered extreme physical injuries and emotional distress, including permanent injuries, and accordingly are entitled to compensatory damages against ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## NINETEENTH CAUSE OF ACTION
### (Race and National Origin Discrimination – NYCHRL)

224.  Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 223.

225.  Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32, by implementing, adopting, enforcing, failing to prevent, failing to remedy, and/or promulgating a policy and practice whereby Plaintiffs were harassed, physically and verbally abused, subjected to harsh conditions of confinement, subjected to routine strip and body cavity searches, burdened in the practice of their sincere religious beliefs, denied adequate exercise, nutrition, medical care, denied access to counsel, and confined in the ADMAX SHU because of their race and national origin, violated N.Y.C. Code §§8-107(4), 8-502.

226.  As a result, Plaintiffs suffered extreme physical injuries and emotional distress,

42

including permanent injuries, and accordingly are entitled to compensatory damages against ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32 jointly and severally in an amount to be determined at trial and punitive damages against each Defendant in an amount to be determined at trial.

## TWENTIETH CAUSE OF ACTION
### (Cruel, Inhuman, or Degrading Treatment – Customary International Law:)

227. Plaintiffs repeat and reallege as if fully set forth herein the allegations contained in paragraphs numbered 1 through 226.

228. The acts described herein had the intent and the effect of grossly humiliating Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and moral resistance.

229. The acts described herein constituted cruel, inhuman or degrading treatment in violation of the law of the nations under the Alien Tort Claims Act, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international treatments, international and domestic judicial decisions.

230. Defendants ASHCROFT, SAWYER, HASTY, ZENK, THOMAS, BUCK, CUSH, GUSS, ORTIZ, PEREZ, BIRAR, SHACK, DEFRANCISCO, MOUNBO, ROBINSON, HOSAIN, COTTON, TORRES, LORENZO, and DOE Defendants NOS. 1-32 are liable for said conduct in that Defendants, acting under the color of law and their authority as federal officers, directed, ordered, confirmed, ratified and/or conspired to cause cruel, inhuman or degrading treatment of Plaintiffs.

231. Plaintiffs were forced to suffer severe physical and psychological abuse and emotional distress and are entitled to monetary damages.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that a judgment be granted as follows:

a.  Awarding compensatory and punitive damages to Plaintiffs for Defendants' violations of constitutional law, federal statutory law, customary international law, and local law, which caused Plaintiffs to suffer physical and emotional harm, in an amount that is fair, just, reasonable and in conformity with the evidence;

b.  Awarding Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988 and N.Y.C. Code § 8-502; and,

c.  Such other relief as this Court deems just and proper.

Dated: New York, New York
       May 3, 2004

THE URBAN JUSTICE CENTER and
KOOB & MAGOOLAGHAN

By: _____
Alexander A. Reinert (AR-1740)
Koob & Magoolaghan
South Street Seaport
19 Fulton Street, suite 408
New York, New York 10038
Tel: 212-406-3095

- and -

Haeyoung Yoon (HY-8962)
Urban Justice Center

666 Broadway, 10th Floor
New York, New York 10012
Tel: 646-459-3003

Attorneys for Plaintiffs

45