LAW OFFICES OF
## RAYMOND R. GRANGER

757 THIRD AVENUE
7TH FLOOR
NEW YORK, NEW YORK 10017

TELEPHONE: (212) 688-1669
FACSIMILE: (212) 688-1929

September 15, 2005

<u>VIA ECF AND FIRST-CLASS MAIL</u>

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  Elmaghraby, et al. v. Ashcroft, et al.,
        <u>E.D.N.Y. Civil Docket No. 04-1809 (JG)(SMG)</u>

        Turkmen, et al. v. Ashcroft, et al.,
        <u>E.D.N.Y. Civil Docket No. 02-2307 (JG)(SMG)</u>

Dear Magistrate Judge Gold:

      I represent David Rardin, a defendant in the <u>Elmaghraby</u> case. Joining in this letter on behalf of their respective clients are Linda Marino (defendant Linda Thomas in <u>Elmaghraby</u>); David Koenigsberg (defendant Jon Osteen in both <u>Elmaghraby</u> and <u>Turkmen</u>, and defendant Angel Perez in <u>Elmaghraby</u>); Allan Taffet (defendant Michael Zenk in both <u>Elmaghraby</u> and <u>Turkmen</u>); Richard Levitt and Yvonne Shivers (defendant Raymond Cotton in both <u>Elmaghraby</u> and <u>Turkmen</u>); Labe Richman (defendant Lindsey Bledsoe in both <u>Elmaghraby</u> and <u>Turkmen</u>); Jerold Wolin (defendants Sydney Chase, Joseph Cuciti, Michael DeFrancisco, Richard Diaz, and Scott Rosebery in both <u>Elmaghraby</u> and <u>Turkmen</u>, and defendants Mario Machado and Brian Rodriguez in <u>Turkmen</u>); Bridgett McMillan (defendants Jai Jaikisson, Dexter Moore, and Reynaldo Alamo in <u>Elmaghraby</u>); Barry Lasky (defendant Clemmet Shacks in both <u>Elmaghraby</u> and <u>Turkmen</u>); Jim Matthews (defendant Marcial Mundo in both <u>Elmaghraby</u> and <u>Turkmen</u>); and James Ryan (defendant Steven Barrere in both <u>Elmaghraby</u> and <u>Turkmen</u>).

      We write to request respectfully that the Court reconsider its decision that depositions of each plaintiff in both the <u>Elmaghraby</u> and <u>Turkmen</u> cases shall be limited to two days. We strongly believe that two days will be insufficient to provide over two dozen defense attorneys representing over thirty

different named defendants[1] in each case sufficient time to protect the rights of their respective clients given the breadth of the allegations made by the plaintiffs in each case.

During the conference on August 24, 2005, when the Court ruled on this issue, there was a brief discussion before the Court that suggested that these cases involved only a few, discrete incidents of abuse or other illegal conduct by a limited number of corrections-officer defendants, and that detailed inquiry would be required by, at most, a relatively few defense attorneys. In fact, a detailed review of the complaints in both cases shows that both actions allege numerous matters involving a multitude of defendants that will require detailed inquiry by many defense counsel. Moreover, the plaintiffs in each case refer to allegedly illegal conduct by government employees that took place "on many occasions," "[e]ach morning," "routinely," as a matter of "practice," "frequently," on a "regular basis," or "several times," further belying any suggestion that only a handful of incidents are at issue.

We are aware of the time constraints imposed by the fact that the plaintiffs are being paroled into the country for purposes of their depositions for a limited period of time, and we will use written interrogatories and written deposition questions (as the Court ordered at the August 24 conference) as a means of obtaining some of the information that we otherwise would obtain at the depositions themselves. However, given the number of defendants in these cases and the number of claims asserted by the plaintiffs (some examples of which are set forth below), we believe that a minimum of three days is necessary to afford each of the defendants even a limited opportunity to question the witnesses in these cases.

Detailed below are examples of the nature and number of the claims that have been asserted by the plaintiffs against the many defendants in these actions.

---

[1] Lieutenant Daniel Ortiz, who is representing himself, will also have the right to question the plaintiffs.

The Honorable Steven M. Gold
September 15, 2005
Page 3

**ELMAGHRABY ET AL. v. ASHCROFT ET AL.**

The following are examples from the first amended complaint in the <u>Elmaghraby</u> case:

- Mr. Elmaghraby alleges that on October 1, 2001, <u>thirteen</u> different corrections officers took actions that violated his rights during several separate incidents:

    (a) five different corrections officers (identified by name) are alleged to have "willfully and maliciously [thrown] Mr. ELMAGHRABY against a wall of the MDC, subjected him to repeated strip searches, including leaving him naked for approximately 40 minutes, and threatened him with death," thereby causing him "to suffer excruciating pain and emotional distress," <u>see</u> First Amended Complaint, ¶¶ 100, 103;

    (b) four different corrections officers (identified by name) -- other than those to which the allegations in (a) above apply -- are alleged to have subjected Mr. Elmaghraby to repeated strip searches and to have "willfully and maliciously dragged [Mr. Elmaghraby] on the ground while he was chained and shackled," thereby "causing him to bleed from his legs" and "to suffer excruciating pain and emotional distress," <u>see</u> First Amended Complaint, ¶¶ 100, 103;

    (c) four different corrections officers -- other than those to which the allegations in (a) and (b) above apply -- as well as a fifth officer to whom the allegations in (a) above do apply (all identified by name), are alleged to have "willfully and maliciously physically and verbally assaulted" Mr. Elmaghraby in an elevator, thereby

The Honorable Steven M. Gold
September 15, 2005
Page 4

>   causing him "to suffer excruciating pain
>   and emotional distress," <u>see</u> First
>   Amended Complaint, ¶¶ 101, 103.

- Mr. Elmaghraby alleges that on "<u>many occasions</u>"
  (emphasis added) he was strip-searched in "an extreme
  and outrageous manner," offering the following
  examples:

  > (a) on an unspecified date, one
  > corrections officer (named) "willfully
  > and maliciously displayed Mr. ELMAGHRABY
  > while naked to a female employee of the
  > MDC," <u>see</u> First Amended Complaint,
  > ¶ 135;

  > (b) on or about October 1, 2001, one
  > corrections officer (named) "willfully
  > and maliciously inserted a flashlight
  > into Mr. ELMAGHRABY's anal cavity,"
  > causing Mr. Elmaghraby to bleed, in the
  > presence of four other corrections
  > officers (named)," <u>see</u> First Amended
  > Complaint, ¶ 135;

  > (c) on or about November 8, 2001, while
  > one named and "other" unnamed
  > corrections officers strip-searched Mr.
  > Elmaghraby, another corrections officer
  > (named) "inserted a pencil into Mr.
  > ELMAGHRABY's anal cavity," <u>see</u> First
  > Amended Complaint, ¶ 135;

  > (d) on or about January 8, 2002, one
  > corrections officer (named) "willfully
  > and maliciously pushed a pencil into Mr.
  > ELMAGHRABY's anal cavity," while four
  > other corrections officers (named)
  > strip-searched Mr. Elmaghraby, <u>see</u> First
  > Amended Complaint, ¶ 135.

- Mr. Elmaghraby alleges that a corrections
  officer (named) confiscated antibiotics that had
  been prescribed due to injuries (including broken
  teeth) sustained when Mr. Elmaghraby had been

The Honorable Steven M. Gold
September 15, 2005
Page 5

>   shoved into a hard object by another corrections
>   officer (unnamed), thereby causing him to suffer
>   "extreme pain and emotional distress," see First
>   Amended Complaint, ¶¶ 181, 183; according to Mr.
>   Elmaghraby, when he complained to a third
>   corrections officer (named), that officer asked
>   Mr. Elmaghraby why he needed his teeth. See First
>   Amended Complaint, ¶ 182.
>
>   • Mr. Iqbal alleges that on January 8, 2002, on
>   the pretense that he was being taken to see his
>   attorney, he was taken to a room where <u>fifteen</u>
>   different, unnamed corrections officers took part
>   in a brutal assault during which, while Mr. Iqbal
>   was "chained and shackled," the officers "picked
>   him up and threw him against the wall, kicked him
>   in the stomach, punched him in the face, and
>   dragged him across the room," thereby causing Mr.
>   Iqbal to suffer "serious physical injuries" and
>   "severe emotional distress." See First Amended
>   Complaint, ¶¶ 113-115.
>
>   • Mr. Iqbal alleges that on March 20, 2002, <u>five</u>
>   different corrections officers (three named, two
>   unnamed) took actions that violated his rights:
>
>>      (a) one officer (named) allegedly
>>      punched Mr. Iqbal in the face, see First
>>      Amended Complaint, ¶ 119;
>>
>>      (b) another officer (named) allegedly
>>      punched Mr. Iqbal in the back and legs,
>>      and kicked him in the back, see First
>>      Amended Complaint, ¶ 119;
>>
>>      (c) en route to the ADMAX SHU, all five
>>      officers "continued to kick, physically
>>      harass, and verbally harass [Mr. Iqbal]
>>      by making racist and violent comments
>>      about Muslims," see First Amended
>>      Complaint, ¶ 120;
>>
>>      (d) when they arrived at the ADMAX SHU,
>>      all five officers "willfully and
>>      maliciously pulled Mr. IQBAL's arm

The Honorable Steven M. Gold
September 15, 2005
Page 6

>   through the slot in his cell door,
>   causing him excruciating pain," <u>see</u>
>   First Amended Complaint, ¶ 121.

- Mr. Iqbal claims that "[e]ach morning" (emphasis added) he was "routinely kicked and punched" (emphasis added) by unnamed corrections officers. <u>See</u> First Amended Complaint, ¶ 137.

According to the complaint, the above-described allegations alone involved <u>eighteen</u> different corrections officers who have been identified by name, and <u>at least eighteen</u> other, unnamed corrections officers.

The plaintiffs also have alleged that <u>eleven</u> different named prison officials or corrections officers at the MDC interfered with their religious practices in some way, allegations that include:

- banging on cells when the plaintiffs were praying, routinely confiscating the Koran, and refusing to permit the plaintiffs to participate in Friday prayer services with fellow Muslims, <u>see</u> First Amended Complaint, ¶¶ 153-63;

- taunting the plaintiffs with comments such as "No prayers for terrorists," and "Why do you need to pray when you are in jail? Go to sleep." <u>See</u> First Amended Complaint, ¶ 154;

- refusing to take action in response to plaintiffs' complaints about interference with their religious practice, <u>see</u> First Amended Complaint, ¶¶ 154-57.

In addition, the plaintiffs also have alleged that <u>nine</u> different named prison officials or corrections officers, and possibly one or more unnamed corrections officers, at the MDC interfered with their rights to counsel in some way, allegations that include:

- prohibiting Mr. Elmaghraby from speaking by telephone with his attorney for approximately two months, <u>see</u> First Amended Complaint, ¶ 166;

- disconnecting the phone if the plaintiffs complained about any of the conditions of their confinement while speaking with their respective attorneys, see First Amended Complaint, ¶¶ 167-68;

- making Mr. Elmaghraby's attorney wait for hours without being able to visit with Mr. Elmaghraby, see First Amended Complaint, ¶ 169;

- videotaping meetings that Mr. Elmaghraby had with his attorney, and forcing Mr. Elmaghraby to submit to strip searches afterward even when the meetings were noncontact, see First Amended Complaint, ¶ 170;

- turning away Mr. Iqbal's attorney from MDC several times and falsely telling the attorney that Mr. Iqbal had been transferred to another facility, see First Amended Complaint, ¶ 171;

- routinely delaying Mr. Iqbal's receipt of legal mail, sometimes by up to two months, see First Amended Complaint, ¶ 171.

The plaintiffs also have claimed that <u>four</u> different corrections officers identified by name exhibited deliberate indifference to their serious medical needs, allegations that include:

- confiscating antibiotics prescribed for injuries that Mr. Elmaghraby had sustained as a result of abuse by one or more corrections officers, and failing to respond to his complaint that his medication had been confiscated, see First Amended Complaint, ¶¶ 181, 182;

- refusing Mr. Iqbal's request for medical treatment for two weeks after he had been beaten by corrections officers, see First Amended Complaint, ¶¶ 187-89.

The specifics of each of the above-cited allegations, as well as related issues such as the possible presence of witnesses, the extent of injuries, whether the plaintiffs attempted to notify anyone of the actions of a given government

employee at any time before their deportation, must be examined in detail if counsel are to protect the rights of their respective clients. Furthermore, even the allegations related to the "John Doe" defendants will require some inquiry by the named defendants. For example, those allegations are relevant to the plaintiffs' credibility and to the issues of when and by whom their alleged injuries were caused.

In addition, we note that the above-detailed examples do not include, among other things, the plaintiffs' general allegations that <u>thirty-four</u> named defendants, and <u>at least nineteen</u> unnamed defendants, should be held liable either for participating in and for willfully and maliciously subjecting the plaintiffs to various forms of mistreatment described in the first amended complaint; being aware of, approving of, and willfully and maliciously creating unlawful conditions of confinement; being deliberately indifferent to and/or recklessly disregarding the risk of taking remedial action; or failing to institute, to create, or to enforce reasonable policies and procedures to curtail unlawful activity. <u>See</u> First Amended Complaint, ¶¶ 194-200.

### **TURKMEN ET AL. v. ASHCROFT ET AL.**

Defense counsel face similar challenges with regard to the allegations in the <u>Turkmen</u> case. The following examples regarding two of the plaintiffs in <u>Turkmen</u> demonstrate the multitude of allegations and number of defendants implicated in that case:

- Mr. Ibrahim alleges that on September 23, 2001, two corrections officers (unnamed) and one lieutenant (identified by name) took actions that violated his rights:

    (a) two corrections officers allegedly pulled Mr. Ibrahim out of a van at MDC and dragged him "by his handcuffed arms to the entrance of the MDC's R&D Area." The corrections officers allegedly "shoved [Mr.] Ibrahim hard against the wall of the building, stunning him and causing him great pain," and "one or more member [sic] of the team" allegedly

The Honorable Steven M. Gold
September 15, 2005
Page 9

> "forcefully pressed [Mr.] Ibrahim's body against the wall for several minutes," <u>see</u> Third Amended Class Action Complaint, ¶ 226;
>
> (b) the lieutenant in charge of the corrections officers during the above incidents allegedly observed the abuse "without making any effort to stop them," and "encouraged them to act on their aggression by belligerently accusing [Mr.] Ibrahim of complicity in the World Trade Center bombing" and by telling him, "If you make any move, you will hit the floor and you will hit it hard." <u>See</u> Third Amended Class Action Complaint, ¶ 226.

- Mr. Ibrahim alleges that on the day he was taken for fingerprinting, two separate teams of corrections officers (unnamed) and one lieutenant (identified by name) took actions that violated his rights:

  > (a) a team of corrections officers allegedly "gripped [Mr. Ibrahim] under his arms and forced him to run at a pace that he could not manage because of his ankle restraints" while "stepping on his ankle chains, causing him to fall forward while the COs at his sides held tightly to his armpits." Mr. Ibrahim alleges that this physical abuse caused him injuries which were never treated, as well as pain and humiliation, <u>see</u> Third Amended Class Action Complaint, ¶ 227;
  >
  > (b) a lieutenant, presumably with the assistance of other corrections officers, subjected Mr. Ibrahim to an unreasonable and unnecessary strip search, <u>see</u> Third Amended Class Action Complaint, ¶ 228;

The Honorable Steven M. Gold
September 15, 2005
Page 10

>   (c) the same team of corrections officers referenced in (a) above allegedly slammed Mr. Ibrahim into the wall in an elevator, thereby "causing him considerable pain," see Third Amended Class Action Complaint, ¶ 228;
>
>   (d) a different team of corrections officers allegedly subjected Mr. Ibrahim to an unreasonable and unnecessary strip search, see Third Amended Class Action Complaint, ¶ 228.

- Mr. Ibrahim alleges that one lieutenant (identified by name) and one corrections officer (identified by name) <u>routinely</u> took actions that violated his rights, including one incident on or about October 11, 2001:

  >   (a) one lieutenant is alleged to have "routinely over-tighten[ed] [Mr.] Ibrahim's handcuffs and ankle restraints causing them to dig into his flesh and inflict pain," see Third Amended Class Action Complaint, ¶ 232;
  >
  >   (b) when conducting pat-down searches of Mr. Ibrahim, one corrections officer would allegedly "grasp [Mr.] Ibrahim's genitals and squeeze them until it caused [Mr.] Ibrahim acute pain," and humiliation, see Third Amended Class Action Complaint, ¶ 232; see also id., ¶ 239.

- Mr. Ibrahim alleges that on or about September 24, 2001, four corrections officers (two identified by name, two unnamed) and one lieutenant (unnamed) "slammed [Mr.] Ibrahim's back into the wall, and held him there tightly while his photograph was taken." See Third Amended Class Action Complaint, ¶ 233.

- Mr. Ibrahim alleges that on October 3, 2001, one lieutenant (identified by name) and four

    corrections officers (one identified by name,
three unnamed) took actions that violated his
rights:

     (a) one lieutenant and four corrections
officers allegedly slammed Mr. Ibrahim
into the wall outside his cell, and
pushed him into the wall inside the
elevator, <u>see</u> Third Amended Class Action
Complaint, ¶¶ 234, 235, 237;

     (b) on two separate occasions, one
corrections officer allegedly told Mr.
Ibrahim, "spread your fucking legs"
while Mr. Ibrahim was shackled, and then
"stepped on the chain in between his
ankles while two other officers held him
up, causing him great pain," <u>see</u> Third
Amended Class Action Complaint, ¶ 235;
<u>see also id.</u>, 237.

- Mr. Ibrahim alleges that on October 11, October
16, and October 25, 2001, one of two corrections
officers (one identified by name, one unnamed)
took actions that violated his rights. According
to Mr. Ibrahim, one or the other of two
corrections officers allegedly told Mr. Ibrahim
"to spread his chained legs and then stepped on
the ankle chain," causing Mr. Ibrahim's ankles to
be badly bruised. <u>See</u> Third Amended Class Action
Complaint, ¶ 238.

- Mr. Ibrahim alleges that on or about mid-
October, 2001, a corrections officer (identified
by name) "began a <u>practice</u> of twisting [Mr.]
Ibrahim's fingers for no apparent reason while he
was being held face to the wall, and continued to
twist [his] fingers at every opportunity, causing
[him] severe pain." <u>See</u> Third Amended Class
Action Complaint, ¶ 241 (emphasis added).

- Mr. Ibrahim alleges that a corrections officer
(identified by name) "was <u>frequently</u> violent and
aggressive" toward him, and, apparently on several
occasions, "shoved [Mr.] Ibrahim's back or pushed

The Honorable Steven M. Gold
September 15, 2005
Page 12

[him] into walls." See Third Amended Class Action Complaint, ¶ 242 (emphasis added).

• Mr. Baloch alleges that on Sept. 21, 2001, five corrections officers (4 identified by name, one unnamed) allegedly "worked as a team to pick [Mr. Baloch] up from under the arms and throw him rapidly and forcefully from corner to corner in his cell, while hitting and kicking him in the back as he fell to the ground," and calling him "a fucking Muslim terrorist" and threatening to kill him. See Third Amended Class Action Complaint, ¶ 205.

• Mr. Baloch alleges that eleven corrections officers (identified by name) violated his rights on a regular basis:

(a) seven corrections officers (identified by name) allegedly "would regularly drag Baloch forward by his waist chain, causing his ankle shackles to dig in; shove Baloch in the back while his chin was against the wall; slam Baloch into walls as they were transferring him; twist Baloch's hands, thumbs, and fingers; step on the chain connecting his ankle shackles, causing the ankle shackles to tighten painfully; and lift his arms or elbows painfully while his wrists were cuffed." Mr. Baloch also alleges that four lieutenants (identified by name) witnessed this treatment and did nothing to stop it, see Third Amended Class Action Complaint, ¶ 214 (emphasis added);

(b) three lieutenants (identified by name) allegedly would "step on Baloch's leg chains, drag Baloch while he was shackled, and slam him into walls" on a regular basis, see Third Amended Class Action Complaint, ¶ 215.

• Mr. Baloch alleges that on October 20, 2001, two corrections officers and one lieutenant (all identified by name) took actions or failed to take

The Honorable Steven M. Gold
September 15, 2005
Page 13

actions that violated his rights, specifically, one corrections officer allegedly "held Baloch's left elbow," while another "lifted his handcuffs, holding Baloch in an extremely painful position," as a lieutenant watched "and did nothing to stop the rough handling of Baloch." See Third Amended Class Action Complaint, ¶ 216.

According to the Turkmen complaint, the above-described allegations pertaining to Mr. Ibrahim involved eight different corrections officers who have been identified by name and seventeen other corrections officers who have not been identified by name, and those related to Mr. Baloch involved eleven different corrections officers who have been identified by name and one corrections officer who was not identified by name.

The Turkmen plaintiffs also have alleged that multiple prison officials and corrections officers interfered with their rights to counsel:

- Mr. Ibrahim alleges that for the first twenty-five days of his detention at MDC, "all the guards," including one lieutenant (identified by name), two corrections officers (one identified by name, one unnamed) and one counselor (identified by name) took actions which violated his rights. Specifically:

    (a) all the guards, including one lieutenant and two corrections officers allegedly denied Mr. Ibrahim's many requests to make phone calls to counsel during the first twenty-five days of his detention, "despite having had two hearings scheduled before an immigration judge in that time period," see Third Amended Class Action Complaint, ¶ 230;

    (b) a counselor is alleged to have purposely dialed wrong numbers when Mr. Ibrahim attempted to contact his lawyer, and generally made legal calls "available at 8:00am or 9:00am, before most attorneys began work"; on other occasions, the counselor allegedly

The Honorable Steven M. Gold
September 15, 2005
Page 14

> reported that "the number [Mr. Ibrahim] requested was busy and that he would therefore have to try again 'next week' or 'next month,'" see Third Amended Class Action Complaint, ¶ 231.
>
> • Mr. Baloch alleges that on November 19, 2001, and on all subsequent occasions, his meetings with his attorney were "recorded on video with sound," causing Mr. Baloch to be reluctant to speak candidly with his attorney. See Third Amended Class Action Complaint, ¶ 220.

The Turkmen plaintiffs also have alleged that multiple prison officials and corrections officers exhibited deliberate indifference to their serious medical needs:

> • Mr. Ibrahim alleges that he sustained pain and bruising on his ankles and arms, which "persisted for about three weeks," and which was never treated. See Third Amended Class Action Complaint, ¶ 227.

As with the examples provided from the Elmaghraby case, the above-detailed examples from the Turkmen case do not include, among other things, the plaintiffs' general allegations that thirty-two named defendants, and at least twenty unnamed defendants should be held liable either for participating in and for willfully and maliciously subjecting the plaintiffs to various forms of mistreatment described in the complaint; being aware of, approving of, and willfully and maliciously creating unlawful conditions of confinement; being deliberately indifferent to and/or recklessly disregarding the risk of taking remedial action; or failing to institute, to create, or to enforce reasonable policies and procedures to curtail unlawful activity. See Third Amended Class Action Complaint, ¶¶ 1-10, 74-76, 134-148.

We respectfully submit that these examples clearly demonstrate that a limit of two days for each deposition will be insufficient to ensure that each defense counsel has even a limited opportunity to question the plaintiffs in these cases. The plaintiffs are being paroled into the United States for the purpose of being deposed and, therefore, the bulk of the time they spend in New York should be devoted to that purpose.

The Honorable Steven M. Gold
September 15, 2005
Page 15

     Accordingly, we respectfully request that the Court reconsider its decision that the depositions of the plaintiffs in the Elmaghraby and Turkmen cases be limited to two days, and order that at least three days be devoted to each deposition.

     Thank you for your consideration of this application.

                               Very truly yours,

                               Raymond R. Granger

cc:  All Counsel of Record (by electronic mail)

     Robert Goldman, Esq. (by first-class mail)
     73 Spring Street
     Suite 402
     New York, New York 10012

     Lt. Daniel Ortiz (appearing *pro se*)(by first-class mail)
     Metropolitan Detention Center
     80 29th Street
     Brooklyn, New York  11232

     Mr. David Rardin